## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

|  |  |
|---|---|
| AMY DOYEL, MICHAEL DOYEL, ALEX PRODES and DAN PRYOR, individually, and on behalf of all others similarly situated,<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>MCDONALD'S CORPORATION, RICHARD ORF, RAYMOND O'LAUGHLIN, AND DANIEL GEHRET,<br><br>       **Defendants.** | **Case No. 4:08-CV-1198-CAS**<br><br>**Judge Charles A. Shaw** |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs, former McDonald's employees who worked together in one Missouri restaurant, concede that McDonald's compensation policies require its employees "to be paid for all time worked."  (Plfs' Motion and Memorandum for Class Certification ("Motion"), Dkt. No 118, at 9.)  Plaintiffs further admit that managers often must manually "edit" employee computerized time punches to ensure that employees are paid for all hours actually worked because they and other employees forget to punch in or out or make mistakes when doing so. Despite these critical concessions, however, Plaintiffs make a sweeping request to certify a statewide class of employees on various claims related to improper editing of time.  Indeed, Plaintiffs ask this Court for such extraordinary relief based only upon a handful of alleged instances of individual managers in one McDonald's restaurant discretely failing to compensate them for hours that they supposedly worked.

Evaluating these types of off-the-clock claims – where there is no systematic reduction of time, but rather unique claims of improper editing of a particular employee's time – requires

highly-individualized testimony as to matters such as what time the employee began work, whether he or she properly clocked in or out for work and for breaks, and whether the employee's total recorded time, as edited, accurately reflects the hours that he or she worked that day. The analysis of the one edit on one shift in one store then has no bearing on any other allegedly inaccurate time edit. Each edit must undergo the same individualized, rigorous analysis making class certification inappropriate. Plaintiffs' own inconsistent and varied testimony as to if and when they may or may not have been paid for time worked makes the point best. And, their attempts to conceal the shortcomings in their case with misstatements of the factual record cannot salvage their claims. Accordingly, despite more than 18 months of discovery, which included McDonald's production of "hundreds of thousands of pages" of documents (Plfs' Motion to Extend Page Limits, Dkt. No. 108, at 1), Plaintiffs' allegations of class-wide unlawful practices remain unsupported and cannot be the basis for the massive class of former and current employees they seek to represent. In short, the Court's initial doubts as to whether this case is appropriate for class certification have proved to be well-founded. (Dkt. No. 72, at 9.)

## **STATEMENT OF FACTS**

McDonald's Corporation ("McDonald's") owns and operates more than 30 restaurants in Missouri, a number that has varied since March 2006. (Ex. I, Pennington Dep. 27:23-28:25.) Of those, roughly five are located in the Kansas City area and the remainder are located in and around St. Louis. Typically, these stores employ salaried managers (Store Manager, First Assistant Store Manager, and Second Assistant Store Manager), hourly-paid managers (Certified Swing Managers and Floor Supervisors), and hourly-paid employees (crew persons).

The named Plaintiffs were employees based at one McDonald's restaurant in Oakville, Missouri. (Ex. B, A. Doyel Dep. 38:10-15, 40:18-22, 44:14-17; Ex. C, M. Doyel Dep. 26:11-18,

27:12-14, 43:21-44:9; Ex. K, Prodes Dep. 17:8-16, 44:17-45:2; Ex. L, Pryor Dep. 11:12-16, 13:5-8, 14:5-13.)  McDonald's employed Plaintiff Michael Doyel off-and-on at the Oakville restaurant between February 2003 and June 2008.  (Ex. C, M. Doyel Dep. 26:11-27:3, 27:12-14, 38:22-25, 43:21-44:9.)  Michael Doyel alleges that he was hired as a crew member and was later promoted to Crew Trainer, then Floor Supervisor, then Certified Swing Manager.  (Id. at 39:16-20.)  Plaintiff Dan Pryor worked at Oakville as a Certified Swing Manager between August 2004 and March 2008 and as a salaried Second Assistant Manager from March 2008 through May 2008.  (Ex. L, Pryor Dep. 11:12-16, 13:5-10, 13:23-14:12.)  Plaintiff Alexander Prodes worked at Oakville from October 2006 through July 2007 as a Certified Swing Manager.  (Ex. K, Prodes Dep. at 17:8-16, 43:1-9, 44:7-11.)  Plaintiff Amy Doyel worked at Oakville from February 2005 to May 2008 as a crew member.  (Ex. B, A. Doyel Dep. 38:10-15, 44:24-45:4.)

## I.     MCDONALD'S POLICY IS TO PAY EMPLOYEES FOR ALL HOURS WORKED.

As Plaintiffs concede (Motion at 9), McDonald's maintains a strict policy that employees "are to be paid for all time worked."  (Ex. K, Prodes Dep. at 102:2-5; Ex. C, M. Doyel Dep. 90:6-8, 217:25-218:6; Ex. B, A. Doyel Dep. 88:11-89:5; see also Ex. H, Orf Dep. 32:13-15, 197:3-7, 211:14-17; Ex. D, Green Dep. 34:12-18; Ex. J, Plaggenburg Dep. 42:6-17, 224:25-225:2; Ex. F, McAllister Dep. 84:19-22; Ex. A, Danner Dep. 253:22-254:4; Ex. G, Morse Dep. 282:13-20.)  This policy is articulated in several ways.  For example, the Company's business conduct policies provide that "[n]o employee is to work 'off the clock'.  All employees are to be paid for all time worked."  (Ex. Z, Def's Dep. Ex. 20 at MCDDOYEL 4077.)  Likewise, McDonald's teaches its employees to "[c]lock in at the beginning of your shift and clock out at the end."  (Ex. Y, Def's Dep. Ex. 19 at MCDDOYEL 3586.)

To ensure that employees are compensated for all hours worked, McDonald's tracks employee time worked using an in-store computer system called an ISP ("In-Store Processor").

(Ex. E, Lewis Dep. 35:19-36:10.)  Employees record their time by clocking in and out at a store cash register, also known as the Point-of-Sale (or POS), which accesses the ISP.  (Id.)  At the time of hire and throughout their employment, McDonald's instructs its employees that they must record all hours that they work by properly punching in and out on the POS. (Ex. M, Bench Dec. ¶ 6; Ex. O, Johnson Dec. ¶ 5; Ex. P, Nash Dec.  ¶ 5; Ex. R, Spurr Dec.  ¶ 5.)

To ensure that an employee's recorded time accurately reflects his or her actual hours worked, the ISP permits certain managers (the level of management varies from store-to-store) to "edit" employee time punches if necessary.  (Ex. E, Lewis Dep. 113:7-9, 118:5-20, 119:18-20.)  For example, a manager must add an in punch if an employee forgets to punch in, add an out punch if an employee forgets to punch out, or add missing break punches if the employee forgets to clock in or out for break.  (Ex. N, Cobb Dec. ¶ 9-11; Ex. Q, Samimi Dec. ¶¶ 11-14.)

While practices from store-to-store vary greatly in this regard, McDonald's takes multiple steps to ensure that employees are apprised of any edits to their time punches.  When time is "closed" each day, restaurant ISPs print a Time Punch Change Approval Report, which lists all of the time punches for the day, including those that have been edited.  (Ex. E, Lewis Dep. 105:22-107:6; 114:4-10.)  In some restaurants, these reports are posted each day in the employee crew room.  (Ex. I, Pennington Dep. 15:6-8.)  In other restaurants (such as the Oakville restaurant), these reports are compiled in binders that are available for employees to inspect. (Ex. O, Johnson Dec. ¶ 9.)  And, in still other restaurants (such as the restaurant in Arnold), managers require employees to review their time punch changes (if any) at the time they pick up their paychecks each pay period.  (Ex. M, Bench Dec. ¶ 11.)

McDonald's also provides several avenues for employees to address workplace concerns, including any issues concerning their pay or recorded time.  For example, in addition to

addressing such issues with an in-store manager, McDonald's maintains an "open door" policy

where any issues can be raised to any level of management.  (Ex. Y, Def's Dep. Ex. 19 at

MCDDOYEL 3590-3591.)  Further, McDonald's provides its employees with a telephone

hotline – the Service Center hotline – for employees to call to lodge pay-related complaints.  (Ex.

P, Nash Dec. ¶ 13; Ex. R, Spurr Dec. ¶ 12.)

## II.   THERE ARE NUMEROUS, LEGITIMATE REASONS WHY A MANAGER MUST EDIT EMPLOYEE TIME PUNCHES.

There are a number of reasons why managers must edit employee time punches to ensure

that the hours an employee works are properly recorded.  For example, employees may:

- Forget to punch in before beginning work;[1]

- Forget to punch out after completing work;[2]

- Forget to punch in or out at all;[3]

- Forget to punch in or out for breaks;[4]

- Punch out for a break but not punch back in; [5]

- Forget to punch out for a break, but punch in upon returning from break;[6]

- Punch in early or late when going on, or returning from, a break;[7]

- Mistakenly enter a double punch (i.e., two punches in quick succession), which the ISP reads as both an in and then an out punch;[8]

- Arrive at work early and punch in, but perform no work until some later point in time;[9]

---

[1] Ex. O, Johnson Dec. ¶ 8; Ex. P, Nash Dec.  ¶ 8; Ex. R, Spurr Dec. ¶ 8.

[2] Ex. O, Johnson Dec. ¶ 8; Ex. P, Nash Dec.  ¶ 8.

[3] Ex. M, Bench Dec. ¶ 10; Ex. O, Johnson Dec. ¶ 8.

[4] Ex. P, Nash Dec. ¶ 8; Ex. R, Spurr Dec. ¶ 8.

[5] Ex. O, Johnson Dec. ¶ 8.

[6] Ex. P, Nash Dec. ¶ 8.

[7] Ex. P, Nash Dec. ¶ 8.

[8] Ex. O, Johnson Dec. ¶ 8; Ex. P, Nash Dec. ¶ 8; Ex. R, Spurr ¶ 8.

[9] Ex. G, Morse Dep. 134:1-135:10.

- Forget to punch in when starting work, but punch in at some later point in time;[10]

- Punch in or out accidentally;[11]

- Punch in or out using the wrong employee identification number;[12] or

- Complete work for the day, forget to punch out, then punch out at a later point in time.[13]

Plaintiffs' own testimony illustrates these disparate scenarios. For example, Plaintiff Dan Pryor testified that, as an hourly and salaried manager at the Oakville restaurant, he edited employee time punches when employees inaccurately recorded time. (Ex. L, Pryor Dep. 23:10-24:15, 56:25-58:1.) Likewise, Plaintiffs Michael and Amy Doyel testified that Oakville managers appropriately edited their time punches when they failed to punch in or out at the beginning or end of a shift, when they failed to clock in or out for a break, or when they entered a double punch. (Ex. C, M. Doyel Dep. 145:20-146:25, 151:10-155:16; Ex. B, A. Doyel Dep. 143:25-149:2.) And a number of other putative class members explained that managers properly edited their time in various instances when they made mistakes recording time. (See, e.g., Ex. M, Bench Dec. ¶ 10; Ex. O, Johnson Dec. ¶ 8; Ex. P, Nash Dec. ¶ 8; Ex. R, Spurr Dec. ¶ 8; Ex. S, West Dec. ¶¶ 10, 12; Ex. T, Woods Dec. ¶ 9.)

## III. PLAINTIFFS' UNIFORMS.

At its Missouri restaurants, McDonald's requires its hourly employees to wear a Company-provided uniform and expects employees to keep those uniforms clean and pressed in appearance. (Ex. Y, Def's Dep. Ex. 19 at MCDDOYEL 3592 ("uniform should always be neat and clean")). Plaintiffs wore a Company-provided uniform during their employment that included a McDonald's shirt, a pair of pants, and a pair of non-slip shoes. (Ex. L, Pryor Dep.

---

[10] Ex. Q, Samimi Dec. ¶ 13.

[11] Ex. L, Pryor Dep. 71:24-72:8.

[12] Ex. E, Lewis Dep. 119:4-15.

[13] Ex. Q, Samimi Dec. ¶ 13; Ex. N, Cobb Dec. ¶ 9.

6

142:15-144:17; Ex. K, Prodes Dep. 135:9-136:24; Ex. C, M. Doyel Dep. 61:17-19, 64:1-5, 65:15-66:5; Ex. B, A. Doyel Dep. 99:10-18.)  McDonald's uniforms are wash-and-wear, meaning that they require no special care – i.e., they can be washed with other clothes and, if properly hung after washing is complete, require no ironing.  (Ex. G, Morse Dep. 230:22-231:1; Ex. S, West Dec. ¶ 4; Ex. A, Danner Dep. 291:15-22.)

From store-to-store, however, the uniforms that employees wear in McDonald's Missouri restaurants vary.  At the restaurant in Earth City, Missouri, for example, employees wear referee shirts.  (Ex. I, Pennington Dep. 174:19-175:7.)  Restaurants also vary in their approach to maintaining employee uniforms.  Some restaurants maintain a wrinkle-release spray that an employee can use if he has allowed his uniform to become wrinkled (e.g., by stuffing it in a bag before coming to work).  (Ex. A, Danner Dep. 291:15-22.)  Other restaurants maintain spare uniforms that an employee can borrow if she allowed her uniform to become wrinkled.  (Ex. I, Pennington Dep. at 173:22-174:6.)  And still other restaurants maintain an ironing board that employees are permitted to use in this circumstance.  (Ex. D, Green Dep. 129:3-7; Ex. H, Orf Dep. 204:15-22.)

## IV.    THE INSTANT LAWSUIT.

On February 29, 2008, Plaintiffs initiated this lawsuit, asserting claims under the Missouri Minimum Wage Law and common law theories of unjust enrichment, quantum meruit, and breach of implied contract.[14]  (Third Am. Compl. ("Compl.") at Counts I-IV.)  Plaintiffs seek to pursue these claims as a class action, on behalf of a putative class consisting of all hourly employees who worked in McDonald's Missouri restaurants since March 1, 2006.  (Id. at ¶ 36.)

On October 20, 2008, McDonald's moved to dismiss substantial portions of Plaintiffs'

---

[14] Plaintiffs also have asserted individual Fair Labor Standards Act claims (Compl. at Counts V & VI), but they do not seek certification of those claims.  (Motion at 6 n.22.)

Second Amended Complaint, including the class allegations.  At that time, the Court did not

strike Plaintiffs' class allegations, but expressed "doubts regarding whether the plaintiffs can

meet the standards set forth in Rule 23 . . . ."  (Dkt. No. 72, at 9.) The Court noted that:

> [P]laintiffs will likely have difficulty proving classwide injury with proof
> common to the class. . . ; proving violations based on statistical analyses . . . ; and
> overcoming the individual case-by-case analysis of their "off-the-clock" claims.
> (Id. at 10.)

## ARGUMENT & AUTHORITIES

In evaluating whether to certify a class, the Court must undertake a "rigorous analysis" to

determine whether Plaintiffs can satisfy each requirement of Federal Rule of Civil Procedure

23(a) and one of the three subdivisions of Rule 23(b).  Amchem Prods., Inc. v. Windsor, 521

U.S. 591, 623 (1997) (citations omitted).  The Court is entitled to look beyond the pleadings and

consider "what the parties must prove." Elizabeth M. v. Montenez, 458 F.3d 779, 786 (8th Cir.

2006); see also In re St. Jude Med., Inc., 522 F.3d 836, 840 (8th Cir. 2008); Blades v. Monsanto

Co., 400 F.3d 562, 570-71 (8th Cir. 2005).  The Court is not required to accept all of the

substantive allegations of the Complaint when ruling on class certification.  See Gries v.

Standard Ready Mix Concrete, LLC, 252 F.R.D. 479, 482-84 (N.D. Iowa 2008) (accepting the

"compelling" line of cases rejecting the proposition that a district court "must accept all of the

complaint's allegations when deciding whether to certify a class.").  Notably, Plaintiffs bear the

burden of proof on all certification issues.  See Amchem, 521 U.S. at 614; Bishop v. Comm. on

Prof. Ethics, 686 F.2d 1278, 1288 (8th Cir. 1982).  Plaintiffs have not met their burden here.

## I.   CLASS CERTIFICATION MUST BE DENIED BECAUSE PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(B)(3).

A key inquiry in applying Rule 23(b)(3)'s standards is whether the Plaintiffs' putative

class claims could be resolved through application of "proof common to the class."  (Dkt. No.

72, at 10.)  As such, class certification is inappropriate where plaintiffs' varied overtime claims

8

could be resolved only through resort to individualized testimony and person-by-person adjudication – such as cases in which plaintiffs assert that particular managers, in episodic and distinct ways, deviated from an established policy of compensating employees for all hours worked.  See, e.g., See In Re: Wal-Mart Wage & Hour Emp. Prac. Litig., 2008 WL 3179315 at *20-21 (D. Nev. June 20, 2008) (individual issues predominate, and class action not superior, where plaintiffs' claimed injuries resulted from isolated instances of managers allegedly deviating from the defendant's lawful policies concerning breaks and prohibition of off-the-clock work); Basco v. Wal-Mart Stores, Inc., 216 F. Supp. 2d 592, 602-604 (E.D. La. 2002) (denying class certification due to highly-individualized nature of plaintiffs off-the-clock claims); Bayles v. Am. Med. Response, Inc., 950 F. Supp. 1053, 1061 (D. Colo. 1996) (denying class certification because "[c]ommon questions do not predominate" when evaluating plaintiffs' claims that defendant failed to pay adequate mealtime, sleeptime, and/or overtime compensation).  This is just such a case.

> **A.    Plaintiffs Cannot Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3) Concerning Their Claims As To Time Edits.**

Plaintiffs allege that managers improperly edited time records by "shaving" time worked at the start and end of a shift, inserting breaks not taken, and lengthening reported breaks to reduce recorded hours.  (Compl. ¶ 22; Motion at 1, 14-17.)  Notwithstanding that the record does not support their generalizations and rhetoric, their claims remain highly-individualized and Plaintiffs cannot satisfy the predominance or superiority requirements of Rule 23.

> 1.    Plaintiffs' Claims As To Time Edits Are Highly-Individualized And Are Not Subject To Common Adjudication.

Plaintiffs concede (Motion at 9) that McDonald's policy is to compensate employees for all hours worked.  (Ex. Z, Def's Dep. Ex. 20 at MCDDOYEL 4077 ("No employee is to work 'off the clock'.  All employees are to be paid for all time worked.")).  They likewise concede that

McDonald's managers must regularly edit employee time punches to ensure that employees are properly compensated for all hours that they work.  (Ex. L, Pryor Dep. 22:23-24:15, 56:25-58:1; Ex. C, M. Doyel Dep. 145:20-146:25, 151:10-155:16; Ex. B, A. Doyel Dep. 138:7-140:4.) Against this backdrop, however, they offer no class-wide mechanism for identifying the *particular* edits made by individual managers that allegedly deprived employees of earned compensation in violation of McDonald's policy.

In such settings, courts properly hold that individual analyses predominate in the resolution of the plaintiffs' claims.  See, e.g., In re St. Jude Med., Inc., 522 F.3d at 840 (denying certification where resolution of "liability to each plaintiff . . . will be dominated by individual issues of causation and reliance"); Blades, 400 F.3d at 570-71 (denying certification because "common proof simply cannot be used"); Dumas v. Albers Med., Inc., 2005 WL 2172030 at *4 (W.D. Mo. Sept. 7, 2005) (individual issues predominate because "class members would be required to present individualized evidence to prove that they, too, [suffered the same injury as the named plaintiff].")  The District Court of Nevada's recent decision in In Re: Wal-Mart Wage & Hour Employment Practices Litigation is particularly illustrative. 2008 WL 3179315 (D. Nev. June 20, 2008).  In that case, plaintiffs alleged that they were improperly paid on various occasions due to edits to employee time entries, including "altering employee records to make it appear they took meal periods when they did not."  Id. at *1.  The court, however, identified multiple individualized issues implicated by such claims:

> Alternatively, the employee could have taken the break but did not swipe in and out for the break.  Indeed, Wal-Mart presents affidavits from employees indicating they engaged in such conduct . . . . [R]esolving Plaintiffs' substantive claims will involve particularized inquiry into each alleged instance of unpaid time to determine if the time records accurately reflected employee behavior or instead documented an instance of unpaid time the employee worked.

Id. at *19; see also Baas v. Dollar Tree Stores, Inc., 2008 WL 5273724 at *2 (N.D. Cal. Dec. 19,

10

2008) (certification denied where propriety of edits to time entries would have to be determined on case-by-case basis); cf. Saleen, 2009 WL 1664451 at *4 (D. Minn. June 15, 2009) ("the myriad reasons" why employees did not take meal breaks makes clear they were not "the victims of a single decision, policy, or plan."); West v. Border Foods, Inc., 2006 U.S. Dist. LEXIS 96963 at *28 (D. Minn. June 12, 2006) (certification denied because of "the individualized nature of the alleged violations, along with the absence of evidence to support the Plaintiffs' conclusory assertion of widespread violations.")

Likewise, the evidentiary record in this case reflects multiple lawful reasons why managers must edit employee computerized time punches to ensure that employees are properly paid. Cf. Harrison v. McDonald's Corp., 411 F. Supp. 2d 862, 869 (S.D. Ohio 2005) (recognizing that time punches must sometimes be edited to ensure proper payment). For example, edits are required when an employee forgets to punch in or out for work, forgets to punch in or out for break, punches in or out late, accidentally enters two punches instead of one, or enters the wrong employee code when punching in or out. (Ex. C, M. Doyel Dep. 145:20-146:25; Ex. L, Pryor Dep. 86:3-12; Ex. B, A. Doyel Dep. 138:7-140:4.) Indeed, Plaintiff Pryor admitted that, as an hourly and salaried manager, he regularly edited employee time punches and did so to ensure that employee time was properly recorded. (Ex. L, Pryor Dep. 23:25-24:15.) Plaintiffs likewise conceded that their own time punches were edited for such legitimate reasons. (Ex. C, M. Doyel Dep. 154:4-9; Ex. L, Pryor Dep. 79:19-23, 80:14-19, 84:20-85:2; Ex. B, A. Doyel Dep. 140:1-4, 145:1-149:2.) Plaintiff Michael Doyel, in fact, admitted that his time punches were edited on several occasions to provide him with more time worked than his original time punches revealed. (Ex. C, M. Doyel Dep. 155:19-157:21.) Similarly, multiple other putative class members testified that their time punches were edited in various instances

11

when they had made mistakes punching in or out and that they were <u>properly</u> paid in each instance.[15]

In this setting, any time that a putative class member alleges that a particular edit by a McDonald's manager was incorrect, the Court must review the time record at issue and hear testimony from the employee, his or her manager that edited the time punch, and any witnesses regarding the circumstances of the edit (among other things) to determine what hours the employee actually worked and whether the edits accurately reflect that time. <u>See</u>, <u>e.g.</u>, <u>Harrison</u>, 411 F. Supp. 2d at 870 (finding nothing inherently unlawful about editing employee time records). And the Court's conclusion as to one edit to one employee's time record would not resolve whether any other edit to that or another employee's time record was improper, let alone permit the Court to make a class-wide liability determination. Because adjudication of these claims would necessitate hundreds, if not thousands, of mini-trials, class adjudication is not superior. <u>See</u> FED. R. CIV. P. 23(b)(3)(D); <u>Blades</u>, 400 F.3d at 569 (upholding denial of class certification because plaintiffs had not provided "common evidence that they have now in hand nor identified any type of common evidence that may yet be discovered which could show injury to [the class members]."); <u>In re Teflon Prods. Liab. Litig.</u>, 254 F.R.D. 354, 371 (S.D. Iowa 2008) (class action not superior due to the myriad individual issues that must be determined to establish liability).

      2.    <u>Editing of Time Varies From Shift to Shift and From Restaurant to Restaurant.</u>

Compounding the individualized nature of Plaintiffs' editing claim is the fact that Plaintiffs, who worked together at just one Missouri restaurant, presented ***no*** evidence that editing practices at McDonald's Missouri restaurants are similar, let alone uniform. Indeed,

---

[15] <u>See</u>, <u>e.g.</u>, Ex. M, Bench Dec. ¶ 10; Ex. O, Johnson Dec. ¶ 9; Ex. P, Nash Dec. ¶ 9; Ex. R, Spurr Dec. ¶ 8; Ex. S, West Dec. ¶¶ 10, 12; Ex. T, Woods Dec. ¶¶ 4, 9.

amidst the ubiquitous rhetoric in Plaintiffs' brief, there are very few citations to common practices in the experiences of the Plaintiffs in Oakville, let alone employees throughout the rest of the Missouri restaurants.

Rather, the evidence demonstrates that editing rates and practices vary greatly from shift to shift and from restaurant to restaurant, belying the notion that McDonald's maintains a class-wide policy or practice in this area.  McDonald's expert Ted Anderson, a labor economist, for example, confirms that there is no class-wide (or even restaurant-wide or shift-wide) practice of editing employee time.  In preparing his expert report, Anderson analyzed the electronic time entries on 490,876 shifts across 39 Missouri restaurants[16] between December 18, 2007 and September 10, 2009.  (Ex. KK, Anderson Report 2-3.)  Anderson's analysis revealed that the frequency of edits that changed employees' reported start or end times, inserted break punches, or lengthened reported break times was low.  (Id. at 6, 8, 10.)  For example, Anderson found that, on approximately 2% of shifts, reported starting or ending times were edited in a manner that reduced reported time; conversely, on approximately 1% of shifts, reported starting or ending times were edited in a manner that increased reported time.  (Id. at 8.)  Moreover, edits were made to lengthen reported break times on less than 1% of shifts; and on another .12% of shifts, reported break times were reduced, which increased the employees' recorded work time.  (Id. at 10.)  Further, while Plaintiffs baldly assert that McDonald's engaged in a uniform practice of inserting break punches into employee time records, Anderson found that break punches were inserted in less than 4% of shifts.  Critically, he found that when an employee did not record any break punches, it was seven times more likely that a manager would not edit the employee's time records to insert break punches than it was that a manager would edit the employees time records

---

[16] While McDonald's has owned and operated more than 30 restaurants during the relevant limitations period, the number has varied over time.

to insert break punches. (Id. at 6.)

Additionally, Anderson's analysis revealed significant variation in the incidence of time edits from store-to-store and, within each store, from shift-to-shift.  (Id. at 2-3.)  Specifically, Anderson found that break punches were manually inserted on less than 1% of shifts at many stores.[17]  (Id. at 6.)  But in isolated stores, he found rates of approximately 11%.[18]  (Id.)  His analysis also revealed substantial variation in the incidence of edits to shift starting or ending times across Missouri stores.  Thus, twelve stores reported such edits on less than 1% of analyzed shifts, five stores reported such edits on 3% of analyzed shifts, and one store reported approximately 9% of shifts with such edits.  (Id. at 9.)

Likewise, when analyzing editing rates shift-by-shift within each store, Anderson found significant variation.  For example, at Store 6040, edits were made to the time punches at the beginning or end of a shift on 7.12% of all morning shifts, .97% of all mid-day shifts, 1.53% of all evening shifts, and 0% of overnight shifts. (Id. at Table 3a.)  Likewise, at store 2147, such edits were made on 1.47% of all morning shifts, 1.38% of all mid-day shifts, .63% of all evening shifts, and 6.12% of all overnight shifts.  (Id.)

> 3.    Plaintiffs Have Adduced Nothing To Overcome The Individualized Nature of Their Claims As To Time Edits.

Plaintiffs offer absolutely nothing to suggest that their claims related to time edits are amenable to resolution via common proof.  First, Plaintiffs suggest (Motion at 16-17) that the Court could distinguish between legitimate and allegedly improper time edits simply "[b]y looking at Defendant's time punch edit reports on a class wide basis."  They provide no support for this claim, however, because it is not true.  Even when presented at deposition with their *own time records*, Plaintiffs could not identify, from the reports alone, a single instance in which they

---

[17] See stores 2216, 4717, 6594, 19157, 25248, 27144 and 29673.

[18] See stores 429 and 24652.

were improperly paid.[19]

Second, Plaintiffs assert – without any citation to the record – that "when an employee's punches are balanced, there is no reason to make any edits."  (Motion at 15.)  Their guess – with no evidence to support it – apparently is that any edit to "balanced" time punches (such as edits that insert two break punches, edits that change reported starting or ending times, or edits that change reported break times) must be improper.  (Id.)  Plaintiffs are wrong.  An employee's computerized time punches are "balanced" (i.e., readable by the ISP) whenever an employee's time records reflect an even number of punches, which the ISP interprets as an "in" punch corresponding with an "out" punch. (Ex. E, Lewis Dep. 118:13-119:3.)  But, as ***undisputed evidence*** in the record substantiates, there are any number of scenarios where balanced punches do not accurately reflect time worked, so a manual edit is needed.  For example, the employee may have clocked in and out for the day, but forgot to clock in and out for her break.  (Ex. P, Nash Dec. ¶ 8; Ex. R, Spurr Dec. ¶ 8.)  The employee may have clocked in immediately upon arriving at the restaurant without performing any work or she may have clocked out well after she ended work (such as if she went to the crew room to talk with friends immediately after completing her last task for the day).  (Ex. G, Morse Dep. 134:1-135:10; Ex. Q, Samimi Dec. ¶ 13; Ex. N, Cobb Dec. ¶ 9.)  Or, the employee may have clocked in early or clocked out late for her break.  (Ex. P, Nash Dec. ¶ 8.)  In short, in any instances in which Plaintiffs claim a violation, there is no less of a need for an individualized inquiry simply because their time punches, prior to any edits, were balanced.

Third, Plaintiffs assert that McDonald's pressures its managers to control labor costs,

---

[19] Ex. C, M. Doyel Dep. 152:4-154: 13, 154:17-155:16, 155:19-156:20, 156:23-157:21, 193:14-195:22; Ex. L, Pryor Dep. 66:1-77:9, 79:12-81:6, 82:19-83:18, 84:15-85:16; Ex. B, A. Doyel Dep. 142:1-149:2; Ex. U, Def's Dep. Ex. 1; Ex. V, Def's Dep. Ex. 2; Ex. W, Def's Dep. Ex. 3; Ex. X, Def's Dep. Ex. 4; Ex. AA, Def's Dep. Ex. 24; Ex. BB, Def's Dep. Ex. 25; Ex. CC, Def's Dep. Ex. 26; Ex. DD, Def's Dep. Ex. 27; Ex. EE, Def's Dep. Ex. 28; Ex. FF, Def's Dep. Ex. 30; Ex. GG, Def's Dep. Ex. 37; Ex. HH, Def's Dep. Ex. 38; Ex. II, Def's Dep. Ex. 39; Ex. JJ, Def's Dep. Ex. 40.

which somehow means McDonald's must be shaving time to do so. For instance, they state (Motion at 14) that "[l]ike most business[es], one of Defendants' key business objectives is to increase profits." This statement may be true, but it is irrelevant to the practices at issue in the instant motion. Plaintiffs also argue (Motion at 8) that McDonald's goal is for its Missouri stores "not to exceed more than 10 hours of overtime per store, per month." Again, this may be true, but it does not support claims of class-wide shaving of time. Likewise, Plaintiffs claim (Motion at 16) that labor costs are a factor in bonuses[20] paid to McDonald's managers. None of this is unlawful, of course, and it in no way diminishes the necessity of individualized inquiry as to whether any edits to time are proper or improper.

To the contrary, multiple managers testified that McDonald's overarching policy is to compensate employees for all hours worked and that they have exceeded overtime targets without consequence. (Ex. A, Danner Dep. 150:6-12, 253:2-254:4; Ex. G, Morse Dep. 61:3-20, 79:10-80:4, 83:10-84:14, 145:2-146:2, 282:13-18.) Multiple managers testified that there are any number of lawful means that they can use to achieve overtime or labor goals, such as appropriate staffing and scheduling. (Ex. A, Danner Dep. 146:11-148:12; Ex. G, Morse Dep. 74:5-9.) Clearly, the existence of *lawful* goals or targets cannot be the common evidence that necessitates class-wide resolution of Plaintiffs' time-editing claims, let alone be the support that even one edit was improper. See Basco v. Wal-Mart Stores, Inc., 2004 U.S. Dist. LEXIS 12441 at *22 (E.D. La. July 1, 2004) ("[A] corporate policy to keep employee wage costs low" is not "sufficient proof to justify the creation of a class . . .").

Fourth, Plaintiffs rely on (Motion at 14) an e-mail suggesting that reductions in labor costs could be achieved by "monitoring [employees'] clock in/clock out time." (Ex. 29 to

---

[20] Labor costs are one of many components to store profitability, which, in turn, is one of many components relevant to a manager's bonus (other factors include guest counts, turnover, profit, and mystery shopper scores). (Ex. A, Danner Dep. 125:7-15.) Food costs are the largest component of profitability. (Ex. H, Orf Dep. 118:1-13.)

16

Motion.)  Not only do they misstate the contents of the email, but the e-mail is not evidence common to the class; multiple field-level personnel testified, without dispute, that they had never seen the document.   (Ex. F, McAllister Dep. 216:21-217:17; Ex. G, Morse Dep. 241:1-25; Ex. I, Pennington Dep. 239:21-240:24.)  And, in any event, it is not unlawful to suggest that managers "monitor[]" the times that employees clock in and out.  To the contrary, federal and state wage laws require employers to monitor employee time.  Once again, this document provides no evidence that <u>any</u> manager improperly edited time, let alone that improper edits were made on a class-wide basis.

Fifth, Plaintiffs cite (Motion at 14) an e-mail from Human Resources Consultant Bob Pennington to Area Supervisor Sue McAllister, in which Pennington uses an Average Wage Tool to illustrate that employees' average rates of pay would change if they worked less hours.  (Ex. 30 to Motion, at MCDDOYEL 104876 (noting that average rates would change if employees worked "one day" fewer)).  Again, this is not evidence common to the class and, in all events, nothing in the e-mail remotely suggests that McAllister should violate McDonald's policy of compensating employees for all hours worked.

> **B.**    **Plaintiffs Cannot Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3) Concerning Their "Automatic" Break-Deduction Claim.**

Plaintiffs likewise cannot meet Rule 23(b)(3)'s predominance and superiority requirements with regard to their claim that McDonald's "automatically" deducted a break period when restaurant computers shut down and restarted each day.

> 1.    <u>Plaintiffs Have No Evidence That McDonald's Automatically Inserts Breaks (Because The Company Does Not Do So).</u>

Plaintiffs identified no common evidence supporting their "automatic" break claim. Indeed, there is no evidence that McDonald's "automatically" deducts time from employee time records when its "computers" shut down, or at any other time, because the Company does not do

17

so.  This was Plaintiffs theory at the outset of the case, but the undisputed testimony by ALL witnesses confirmed that no automatic deductions occurs.  Still, despite the overwhelming evidence to the contrary, Plaintiffs frivolously ask this Court to certify the class nonetheless.

Although the POS system (the cash registers where employees punch "in" and "out" for shifts) in each restaurant restarts each day for a brief period of time, undisputed testimony and employee time records reveal that this activity **does not** result in a shutdown of the ISP timekeeping system, a wholly separate system.  Nor does it result in any insertion of a break into employee time records or any systematic loss of time or pay.  (Ex. E, Lewis Dep. 33:18-36:10, 39:23-40:9, 141:1-142:17, 147:8-148:16.)  McDonald's own expert in charge of the ISP system, Michael Lewis, confirmed this.  *Id*.  And McDonald's outside expert, Ted Anderson, analyzed time records and confirmed that there is no "automatic" insertion of break times into employee time records. (Ex. KK, Anderson Report at 6-8.)  Anderson found no evidence that break punches were uniformly inserted at any store; rather, the data showed that the rate of insertion of breaks – while relatively low to begin with – is highly varied from store to store and from shift to shift.  (Id.)

For their part, Plaintiffs make the outrageous claim (at 12) that the POS shutdown is "effectively . . . a black hole in time which Defendants count as an automatic, unpaid break for its overnight employees," then seek to mischaracterize other testimony to cover up the sleight of hand.  *See infra* at 30, § IV.  Indeed, their representation (Motion at 15-16) that "all four Plaintiffs unequivocally aver that McDonald's automatically deducted break times even though they worked through such 'break periods'" is belied by their own deposition testimony.  At deposition, the Plaintiffs claimed only that particular managers made improper manual edits to their time records, not that breaks were inserted through an automated computer process.  (Ex. B,

18

A. Doyel Dep. 19:12-23; Ex. C, M. Doyel Dep. 180:21-181:5; Ex. K, Prodes Dep. 123:21-124:6.)  They could not point to any evidence of an automated process.

For this reason, Plaintiffs' reliance (Motion at 29) on Bouaphakeo v. Tyson Foods, 564 F. Supp. 2d 870 (N.D. Iowa 2008), is misplaced.  There, the court noted that Plaintiffs proffered "common evidence that [the employer's] compensation system cannot account for even the basic or standard PPE employees need to don, doff, and clean" at one facility.  Id. at 909.  Here, by contrast, Plaintiffs have not – and cannot – offer proof that McDonald's automatically inserted breaks into employee time records.

> 2.   Resolution of Plaintiffs' "Automatic" Break Claim Would Require Highly-Individualized Analyses.

Class certification of Plaintiffs' "automatic" break claim is independently precluded because its resolution would turn on a series of fact-intensive, individualized inquiries.  See Clausnitzer v. Fed. Express Corp., 248 F.R.D. 647, 654 (S.D. Fla. 2008) (denying class certification because "class treatment would gloss over countless individual inquiries necessary to properly adjudicate whether work was actually being performed during  . . . unpaid breaks"); Saleen, 2009 WL 1664451 at *5 (although employer automatically deducted 30-minute meal break from employee time records, the reasons alleged by plaintiffs for the employer's failure to compensate employees who worked through meal breaks "[were] too varied for the Court to conclude that there is a single decision, policy, or plan . . . to not compensate its . . . employees for time worked through meal breaks").

For example, Plaintiffs testified that, on the overnight shift, they sometimes took 30 minute breaks, sometimes took breaks of less than 30 minutes, and sometimes took no break at all.  (Ex. C, M. Doyel Dep. 165:18-25; Ex. B, A. Doyel Dep. 66:15-17; Ex. L, Pryor Dep. 45:21-46:15, 48:14-49:17, 104:9-14; Ex. K, Prodes Dep. 123:7-12, 131:12-15.)  Plaintiff Michael

Doyel testified that whether he took a break depended on a number of factors, including the day of the week, how many employees worked the shift, the quality of the employees on the overnight crew, the amount of cleaning performed on the overnight shift, and how much preparation work the overnight crew had to do in advance of the morning shift.  (Ex. C, M. Doyel Dep. 173:17-174:8.)  He admitted that such factors varied from night-to-night.  (Id. at 174:9-12.)  Likewise, Plaintiff Amy Doyel conceded that she may have taken breaks she did not record and, in such instances, she was actually paid for the time she was on break.  (Ex. B, A. Doyel Dep. 173:21-174:2, 177:4-11.)  Accordingly, in order to determine whether Plaintiffs or any other class members were deprived of pay, the Court would again need to hear testimony – from the employee, his or her manager, and any witnesses – regarding whether the challenged edits accurately reflected time spent on break and, if it did not, whether the employee was nonetheless properly paid for the break time taken.  Thus, no common issue would predominate in a class adjudication of such claims.

      **C.**      **Plaintiffs Also Cannot Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3) Concerning Plaintiffs' Off-the-Clock Claims.**

For similar reasons, Plaintiffs cannot meet Rule 23(b)(3)'s predominance and superiority requirements with respect to their various other claims of off-the-clock work. (Compl. ¶ 23.)

      1.      <u>McDonald's Written Policy Prohibits Off-The-Clock Work.</u>

Plaintiffs found no evidence that McDonald's maintains a policy or practice of requiring employees to work off-the-clock (again, because this is not so).  To the contrary, as Plaintiffs' acknowledge, McDonald's policy <u>prohibits</u> off-the-clock work.  (Ex. Z, Def's Dep. Ex. 20 at MCDDOYEL 4077) ("No employee is to work 'off the clock'.  All employees are to be paid for <u>all</u> time worked.")).  And, consistent with this policy, multiple putative class members testified that that they have never worked without pay, that no manager has ever told them to work off-

the-clock, and that they have been paid for all hours worked.[21]  This Court should deny class

certification on this basis alone.

>    2.    Plaintiffs' Off-the-Clock Claims Are Individualized and Not Subject to
>          Adjudication Through Common Proof.

Class certification also is precluded because resolution of Plaintiffs' off-the-clock claims

would require a series of highly-individualized analyses.  See, e.g.,  Babineau v. Fed. Express

Corp., 576 F.3d 1183, 1191, 1194 (11th Cir. 2009) (affirming refusal to certify off-the-clock

claims because individualized proof would be required to establish the existence and duration of

any off-the-clock work); England v. Advance Stores Co., 2009 U.S. Dist. LEXIS 79329 at *108-

109 (W.D. Ky. Sept. 2, 2009) (denying certification because resolving off-the-clock claims

would require individualized proof from a multitude of managers and employees both as to

liability and damages).

Once again, Plaintiffs' own testimony underscores the limited and isolated nature of their

off-the-clock allegations.  Whereas other putative class members testified that they never worked

off-the-clock, the named Plaintiffs allege that certain managers (but by no means all) at one

restaurant required them to do so on distinct occasions.  Plaintiff Dan Pryor, for example,

testified that Oakville Store Manager Deana Danner sometimes required him to work off-the-

clock, but he conceded that Deina Morse (who became Store Manager at Oakville immediately

after Danner) never required him to do so.  (Ex. L, Pryor Dep. 28:9-31:6, 36:2-40:6.)  Further,

while Pryor and Plaintiff Prodes asserted that they were singled out for off-the-clock work as

hourly supervisors, they conceded that other employees on their shifts were not required to

perform such work.  (Ex. L, Pryor Dep. 39:3-25; Ex. K, Prodes Dep. 66:3-22.)

Further, the purported tasks that Plaintiffs allege to have performed off-the-clock at

---

[21] See, e.g., Ex. M, Bench Dec. ¶ 12; Ex. O, Johnson Dec. ¶ 11; Ex. P, Nash Dec. ¶ 12; Ex. R, Spurr Dec. ¶ 11; Ex. S, West Dec. ¶ 9; Ex. T, Woods Dec. ¶ 8

Oakville vary greatly.  Plaintiff Prodes testified that he had unique training requirements that he was required to perform off the clock.  (Ex. K, Prodes Dep. 74:19-24; 102:8-103:18; 143:16-145:5.)  He also asserted that a manager required him once to pick up salt to de-ice the restaurant parking lot after clocking out.  (Ex. K, Prodes Dep. 70:15-73:8.)  But Prodes' allegations are unlike those of Plaintiff Michael Doyel, who alleged that he might spend a few seconds or minutes off-the-clock answering the phone or helping a customer at the beginning or end of a shift.  (Ex. C, M. Doyel Dep. 203:17-207:12, 208:18-25.)  And Doyel's claims were different still from those of Plaintiff Pryor, who testified that he would sometimes perform pre-shift checklists before clocking in.  (Ex. L, Pryor Dep. 28:9-11.)  Moreover, Plaintiffs readily concede that they do not know whether other employees were paid for all their time worked.  (Ex. K, Prodes Dep. at 138:2-13; Ex. L, Pryor Dep. at 45:15-19, 115:11-14, 118:7-9, 150:9-18; Ex. C, M. Doyel Dep. at 160:18-21, 178:8-21, 179:13-17, 208:17, 216:11-20, 239:14-23, 240:24-241:10.)

Therefore, to resolve even one employee's off-the-clock claim for one shift, the Court would need to make a series of factual inquiries related to the employee's actual work hours and whether McDonald's suffered or permitted any uncompensated work, including:

> **a.      On the shift in question, did the employee work off-the-clock?**

Many putative class members, from a variety of restaurants, testified that they have never worked off-the-clock.  (Supra at 21 n.21.)  Plaintiffs, on the other hand, testified that they were involved in only isolated, sporadic incidents of supposed off-the-clock work at Oakville.  Further, they testified that, even within the Oakville restaurant, whether they worked off-the-clock, and for how long, would vary depending on the shift they were working, which manager was running the shift, and other unique factors.  (Supra at 21-22.)  Thus, in evaluating Plaintiffs' or any other employee's off-the-clock claim, the Court must determine whether the employee worked off-the-clock on the day in question and, if so, for how long.

### b.    On the shift in question, did a manager instruct or permit the employee to work off-the-clock, contrary to policy?

Multiple managers from different restaurants testified that McDonald's policy prohibits off-the-clock work and that they never instructed employees they supervised to work off-the-clock.  (Ex. N, Cobb Dec. ¶ 4; Ex. G, Morse Dep. 282:13-18; Ex. Q, Samimi Dec. ¶ 4; Ex. A, Danner Dep. 253:2-9, 253:22-254:2-4.)  Plaintiff Pryor testified that Oakville Store Manager Deana Danner – but not Oakville Store Manager Deina Morse – threatened to take away his scheduled day off from work if Pryor or any crew member he supervised earned overtime.  (Ex. L, Pryor Dep. 28:9-29:4.)  Danner, however, testified that neither she nor the managers who reported to her (including Pryor) ever deprived employees of earned overtime.  (Ex. A, Danner Dep. 310:8-11.)  Thus, for every employee who would claim to have worked without recording his time, the Court would need to hear testimony from the manager and witnesses to determine – for every shift in question – whether the manager instructed the employee to work off-the-clock. Moreover, lack of actual or constructive knowledge of off-the-clock work is a defense against liability for allegedly unpaid overtime. See Hertz v. Woodbury County, 2008 WL 2095553 at *6 (N.D. Iowa May 16, 2008).  McDonald's is entitled to present testimony on this point.

### c.    On the day in question, did an employee allegedly performing off-the-clock work act unreasonably by failing to report his hours worked?

Plaintiffs admit that they understood McDonald's policy is to pay employees for all hours worked, but testified that on occasion they did not report all their hours to management or otherwise seek compensation for such time.  (Ex. C, M. Doyel Dep. 207:14-20, 215:2-9, 217:25-218:6; Ex. B, A. Doyel 123:3-6; Ex. L, Pryor Dep. 127:25-128:5.)  This kind of testimony does not demonstrate that a common policy of off-the-clock work exists.  See Saleen, 2009 WL 1664451 at *4 (because employees did not report time worked to employer for variety of

reasons, plaintiffs cannot show they "were together the victim of a single decision, policy, or plan."). And, if an employee claimed to have worked off-the-clock, the Court would need to hear individual testimony – from the employee, his or her manager, and any witnesses – to determine whether the employee indeed failed to report all hours worked, and if so, why. See Basco, 216 F. Supp. 2d at 603 (defendant has right to defend off-the-clock claims with evidence that a putative class member had knowledge of employer's policies banning off-the-clock work and voluntarily chose to engage in such work in violation of such policies).

> **d.     Did an employee with allegedly unrecorded hours get paid for that time?**

In order to determine whether Plaintiffs or any putative class members were deprived of pay for unrecorded hours, the Court would need to hear testimony regarding whether the employee was nonetheless properly paid through insertion of time elsewhere. For instance, employees testified that they have, on occasion, worked without first clocking in, but that their time entries were later corrected so that they were properly paid. (See, e.g., Ex. P, Nash Dec. ¶ 11; Ex. S, West Dec. ¶ 8.)

In sum, individualized allegations that certain managers at one restaurant may have required occasional off-the-clock work– in violation of Company policy – cannot satisfy Plaintiffs' burden to demonstrate an unlawful policy dictating uncompensated work throughout Missouri, and it only serves to underscore the necessity of person-by-person and instance-by-instance adjudication. See, e.g., Thompson, 2009 WL 130069 at *3 (evidence that "tiny fraction" of putative class may not have received all compensation earned failed to establish that this was due to corporate decision as opposed to actions of one rogue manager at one store); Seevers v. Carrols Corp., 528 F. Supp. 2d 159, 174 (W.D.N.Y. 2007) (denying certification where plaintiffs alleged rogue managers failed to compensate plaintiffs for all hours worked in

24

violation of lawful company policies); <u>West</u>, 2006 U.S. Dist. LEXIS 96963 at *19 (Plaintiffs'

allegations that a limited sampling of employees (2.5% of proposed class) were allegedly

required by their store managers to work off-the-clock "does not support the Plaintiffs' assertion

of widespread violations resulting from a common policy or plan.").[22]

### D. Plaintiffs Cannot Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3) Concerning Their Uniform Claim.

Plaintiffs also cannot meet Rule 23(b)(3)'s predominance and superiority requirements as

to their claim for compensation for time spent maintaining their uniforms. (Compl. ¶ 24.)

### 1. Plaintiffs' Claim Is Not Legally Cognizable.

In deciding whether to certify a class, the Court may look beyond the pleadings to the

"claims, defenses, relevant acts and applicable substantive law." <u>Unger</u>, 401 F.3d at 321. As

part of this inquiry, "a decision that the claim of the named plaintiffs lacks merit ordinarily . . .

disqualifies the named plaintiffs as proper class representatives. The effect is to moot the

question of whether to certify the suit as a class action . . ." <u>Cowen v. Bank United, FSB</u>, 70

F.3d 937, 942 (7th Cir. 1995); <u>Tucker v. Intel Corp.</u>, 141 Fed. Appx. 524, 525 (9th Cir. 2005)

(Plaintiff "can no longer pursue the class claims because his individual claim has been

extinguished.")

---

[22] Plaintiffs' various off-the-clock cases (Motion at 30 n.118) are inapposite. In some, the Court did not even analyze Rule 23's class-certification requirements. <u>See</u> <u>McLaughlin v. Ho Fat Seto</u>, 850 F.2d 586 (9th Cir. 1988); <u>Bull v. U.S.</u>, 68 Fed. Cl. 276 (Ct. Claims 2005); <u>Brzychnalski v. Unesco, Inc.</u>, 35 F. Supp. 2d 351 (S.D.N.Y. 1999). Others have been reversed or abrogated. <u>Wang v. Chinese Daily News, Inc.</u>, 231 F.R.D. 602 (C.D. Cal. 2005) (abrogated by <u>Vinole v. Countrywide Home Loans, Inc.</u>, 571 F.3d 935 (9th Cir. 2009). And, in others, the court certified classes where the plaintiffs did proffer proof common to the class – unlike the Plaintiffs in this case – such as evidence that the employer systematically failed to treat certain activities (such as donning and doffing protective gear) as compensable work activities. <u>See, e.g.</u>, <u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21 (2005); <u>U.S. Dept. of Labor v. Cole Enters.</u>, 62 F.3d 775 (6th Cir. 1995); <u>Spoerle v. Kraft Foods Global, Inc.</u>, 2008 WL 2002221 (W.D. Wisc. May 6, 2008); <u>Torres v Gristede's Operating Corp.</u>, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006); <u>Gutierrez v. Kovecavich "5" Farms</u>, 2004 WL 3745224 (E.D. Cal. Dec. 2, 2004); <u>Braun v. Wal-Mart, Inc.</u>, 2003 WL 22990114 (Minn. Dist. Ct. Nov. 3, 2003); <u>Ladegaard v. Hard Rock Concrete Cutters, Inc.</u>, 2000 WL 1774091 (N.D.Ill. Dec. 1, 2000); <u>Armijo v. Wal-Mart Stores, Inc.</u>, 142 N.M. 557, 168 P.3d 129 (N.M. Ct. App. 2007); <u>Hale v. Wal-Mart Stores, Inc.</u>, 231 S.W.3d 215 (Mo. Ct. App. 2007); <u>Vignaroli v. Blue Cross</u>, 360 N.W.2d 741 (Iowa 1985). As noted, Plaintiffs present no such common evidence in this case.

In this regard, it is well-settled that an employee is not entitled to compensation for time spent maintaining wash-and-wear uniforms that require no special cleaning process.  See, e.g., 29 U.S.C. § 254(a) (preliminary and postliminary activities not compensable under the FLSA); Department of Labor Field Operations § 30c12(b)(5)(1998) ("[T]he time spent in washing uniforms will not be considered hours worked for either [minimum wage] or [overtime] pay purposes.").  McDonald's, in fact, provides its employees with wash-and-wear uniforms that can be easily laundered with other clothes and require no ironing if properly hung or folded after washing.  (Ex. G, Morse Dep. 230:11-231:1.)  And, not surprisingly, Plaintiffs offer no legal support for the contention that they are entitled to compensation for the minimal time they may have spent washing their McDonald's clothes with their other clothes.  Cf. Reich v. N.Y. City Transit Auth., 45 F.3d 646, 649 (2d Cir. 1995) (expressing disapproval of wage-hour decisions that would "disregard . . . long-established customs . . . creating wholly unexpected liabilities, immense in amount and retroactive in operation").

2.      Plaintiffs' Claims Are Individualized In All Events.

Even if Plaintiffs' uniform claims were cognizable, they cannot satisfy Rule 23(b)(3)'s requirements because these claims would turn on highly-individualized inquiries.  For example, the Court would need to determine, for each employee, what uniform he or she wore because uniforms vary from store-to-store:

> [T]here are different types of uniforms and different requirements, an example would be our Earth City McDonald's is next to the Rams' training complex, and they use things like referee shirts and things like that, so as long as it's a McDonald's approved uniform, there could be differences between restaurants.

(Ex. I, Pennington Dep. 174:22-175:5.)  The Court also would need to determine how individual managers handle maintenance of McDonald's uniforms because the evidence revealed substantial variation in this regard.  (Compare Ex. S, West Dec. ¶ 4 (uniform must have no

"stains and be wrinkle-free" but I am not "required to iron my uniform"); Ex. A, Danner Dep.

291:15-22 (instructions to crew might include referring employees to Downy Wrinkle Release or

instructing employee to take uniforms out of the dryer before they wrinkle); Ex. G, Morse Dep.

230:18-19 (does not require employees to iron uniform); with Ex. L, Pryor Dep. 142:15-144:17

(received five shirts and "more pants than he could count," washed his uniform with street

clothes, and ironed shirts and pants); Ex. K, Prodes Dep. 135:9-136:24 (received two shirts and

two pairs of pants, washed his uniform every two days with his street clothes for "personal

cleanliness" and pants required no ironing); Ex. C, M. Doyel Dep. 61:17-19, 64:1-5, 19-22,

65:15-66:5 (chose not to wash uniform with street clothes and chose to iron uniform).  Further,

the record reveals that employees – many of whom are teenagers or young adults who live with

their parents – may not even do their own laundry.  (Ex. C, M. Doyel Dep. 67:2-10; Ex. B, A.

Doyel Dep. 37:24-38:9.)[23]

### E.    Plaintiffs Cannot Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3) As To Their Common Law Claims.

Plaintiffs neglect to provide any legal basis to support class certification on their common

law claims for breach of implied contract, unjust enrichment, and *quantum meruit*.  Instead, they

plainly assert that "[t]he elements of each claim are essentially identical," and go no further.

(Motion at 7.)  But Plaintiffs' common law claims are particularly problematic and inappropriate

for class-wide resolution because they too are highly individualized.

---

[23] In support of their claim, Plaintiffs' misrepresent the testimony of Operations Manager Rick Orf. Contrary to Plaintiffs' representation (Motion at 17), Orf never testified that "Plaintiffs who arrived at work with a wrinkled uniform were required to iron their uniform on a McDonald's ironing board without pay and before such employees could punch in and start work."  Rather, Orf testified that some of the stores have ironing boards so that, hypothetically, "if an employee comes in with their shirt in a back pack and they take it out and it's wrinkly and not professional, they are to go back and iron their shirt," but he "***didn't know***" whether such time spent ironing would be compensated. (Ex. H, Orf Dep. 204:15-205:11) (emphasis added).  Moreover, Orf was clear that there is variation as to whether a particular store has an ironing board or not.  (Id. at 204:15-22.)

For instance, the resolution of any claim of breach of implied contract will depend on "highly-specific issues, including: (1) whether [McDonald's employees] made offers to plaintiffs, (2) if so, whether those offerors had apparent or actual authority to make the offer, (3) what were the conditions of the offer and terms agreed on by the parties, and (4) whether, and to what extent, was each contract breached." Basco v. Wal-Mart Stores, Inc., 216 F.Supp.2d 592, 602-03 (E.D. La. 2002) (denying class certification on plaintiffs' breach of contract claims). Indeed, every alleged "'contract' at issue . . . was created at a different time, by different employees, [] under different circumstances," and may be subject to different defenses. Id.; see also Babineau v. Federal Exp. Corp., 576 F.3d 1183, 1195 (11th Cir. 2009) (affirming denial of class certification on breach of contract claim).

For the same reasons, Plaintiffs' claims for unjust enrichment and quantum meruit are not amenable to class certification.  See Babinueau, 576 F.3d at 1195 (affirming denial of class certification on *quantum meruit* claim and noting, "a *quantum meruit* claim is highly individualized.").  Resolution of these claims requires inquiries into both parties' conduct and expectations as to each alleged violation to determine, at a minimum: whether the employee provided a valuable service that benefited McDonald's; whether McDonald's knew of the benefit and unjustly retained it; and whether the employee was not reasonably compensated.  See In Re: Wal-Mart Wage & Hour Emp. Prac. Litig., 2008 WL 3179315 at *19 (denying class certification on plaintiffs' *quantum meruit* claim).

In this Circuit, plaintiffs must be able to establish a *prima facie* case for each class member based on common evidence in order to certify a class.  See Blades v. Monsanto Co., 400 F.3d at 566.  Here, Plaintiffs have not identified any common evidence that would establish a *prima facie* case for each class member on their common law claims.

28

## II.     PLAINTIFFS CANNOT SATISFY THE TYPICALITY AND ADEQUACY REQUIREMENTS OF RULE 23(a) AS TO ANY CLAIM.

Independently, and a further reason class certification is inappropriate, Plaintiffs failed to satisfy the requirements of Federal Rule of Civil Procedure 23(a).  Rule 23(a)(3) provides that a class may be certified if, among other things, the "claims or defenses of the class representatives [are] typical of the claims or defenses of the class."  This "typicality" requirement examines "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  In addition, Rule 23(a)(4) provides that a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class."  Under this "adequacy" requirement, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  Falcon, 457 U.S. at 156 (quoting Schlesinger v. Reservists Comm., 418 U.S. 208, 216 (1974)).

Plaintiffs have provided no evidence that their alleged injuries were typical of injuries suffered by others in their restaurant, let alone employees in other restaurants.  For instance, while they make the blanket assertion (Motion at 25-26) that "all other members of the class . . . were denied wages, including overtime," they offer no evidence that this is so.  See, e.g., Gries v. Standard Ready Mix Concrete, LLC, 252 F.R.D. 479, 482-84 (N.D. Iowa 2008) (there is "nothing to recommend" the proposition that "a district judge must accept all of the complaint's allegations when deciding whether to certify a class.").  Indeed, at deposition, ***Plaintiffs repeatedly admitted*** that they are not aware of employees, other than themselves, who were not paid properly for their hours worked.  (Ex. C, M. Doyel 160:18-21, 174:13-24, 178:5-21, 179:13-17, 208:25-209:17, 215:21-216:20, 240:19-241:10; Ex. B, A. Doyel Dep. 189:23-190:3; 192:17-

29

195:4, 202:8-10, 202:21-203:2, 215:2-5; Ex. K, Prodes Dep., 137:23-138:13, 147:1-148:16; Ex. L, Pryor Dep. 38:21-39:20.)

Further, the record reveals that Plaintiffs' alleged injuries are not typical of the injuries Plaintiffs allege were suffered by other putative class members. For instance, Plaintiffs seek to represent employees whose recorded breaks were increased to "greater than 20 minutes to avoid requirements that rest breaks of less than 20 minutes be paid." (Compl. ¶ 22.) Yet, none of the Plaintiffs testified that they experienced any such injury. (Ex. C, M. Doyel Dep. 159:13-16; Ex. K, Prodes Dep. 8:9-9:17; Ex. B, A. Doyel Dep. 20:2-22, 200:24-25.) Plaintiffs also seek to represent employees whose time was "shaved" at the beginning or end of their shifts (Compl. ¶ 22), but none of the Plaintiffs testified that they experienced this. (Ex. C, M. Doyel Dep. 159:13-16; Ex. K, Prodes Dep. 8:9-9:17; Ex. B, A. Doyel Dep. 20:2-22, 200:24-25.) Nor have Plaintiffs shown, as they must, that their individual claims are based on anything other than conduct unique to them. To the contrary, Plaintiffs admit that they know nothing about practices at restaurants where they did not work, and they have produced no evidence from those locations. (Ex. K, Prodes Dep. 45:3-6; Ex. L, Pryor Dep. 45:15-19, 150:9-18; Ex. C, M. Doyel Dep. 62:15-63:8, 241:6-10; Ex. B, A. Doyel Dep. 194:20-195:4, 202:24-203:2.)

As still another ground precluding certification, the purported class contains irreconcilable intra-class conflicts. See Ellerd v. County of Los Angeles, 2009 U.S. Dist. LEXIS 36865 at *13-14 (C.D. Cal. Apr. 9, 2009) (rejecting class certification where, to prove their claims, some class members would have to show that other class members violated federal law and the employer's policies by instructing them not to record their overtime). In this case, Plaintiffs' proposed class includes managers (who may have authority to direct the workforce and edit time) and non-managerial employees (who do not). For instance, Plaintiff Dan Pryor, as

a manager with authority to edit time, testified that he edited the time entries of other potential

class members.  (Ex. L, Pryor Dep. at 52:15-54:23)  Thus, Plaintiffs' claims could lead to

scenarios in which one class member is accusing another of violating McDonald's policies and

the law. <u>Morgan v. United Parcel Serv., Inc.</u>, 169 F.R.D. 349, 357-58 (E.D. Mo. 1996).  For such

reasons, Plaintiffs cannot meet the requirements of Rule 23(a).

## III.   PLAINTIFFS' REPEATED MISSTATEMENT OF THE FACTUAL RECORD CANNOT SALVAGE THEIR CLAIMS.

Faced with a lack of evidence to support their class-wide aspirations, Plaintiffs resort to

misstating the factual record to persuade the Court to certify their claims.  Such improper

techniques cannot be condoned.  By way of example:

- Plaintiffs state (Motion at 18) that "Defendants' testimony confirmed that Plaintiffs regularly perform work . . . without pay and without any practice for recording such time worked."  In support of this claim, Plaintiffs cite (<u>id.</u> at 18 n. 75) to the testimony of Human Resources Consultant Bob Pennington.  Pennington testified, however, that he was <u>not</u> aware of any employee who failed to receive compensation for all hours worked, and that he <u>was</u> aware of a practice for recording time if an employee happened to perform work before or after the employee's scheduled shift.  (Ex. I, Pennington Dep. 161:6-11, 163:14-165:21).

- Citing the testimony of Operations Manager Rick Orf, Plaintiffs represent (Motion at 17) that "Defendants' management confirmed that Plaintiffs who arrived at work with a wrinkled uniform were required to iron their uniform on a McDonald's ironing board without pay and before such employees could punch in and start work."  But, in the cited testimony, Orf actually stated that he "[didn't] know" whether or not an individual restaurant would compensate an employee if she ironed her uniform in the restaurant (assuming the restaurant had an ironing board). (Ex. H, Orf Dep. 202:22-208:13).

- Plaintiffs allege (Motion at 14) that "McDonald's executives and HR employees have also performed analysis detailing the impact of shaving one or two hours of employee pay per week on McDonald's bottom line."  But the record does not support their hyperbole.  Plaintiffs try to support their statement by offering an e-mail drafted by Stephanie Marshall, who is not a McDonald's employee, let alone an "executive [or] HR employee."  And, this email hardly analyzes time-shaving; rather, it advises that managers should "monitor clock-in/clock out times" and "find a hidden 5.7 hours" – it in no way suggests that managers should improperly "shave" employee pay.  The Plaintiffs also cite an e-mail from Human Resources Consultant Bob Pennington to Operations Consultant Susan McAllister, which discusses the impact that "reducing" the number of

hours that employees are scheduled to work will have on the restaurant's average wage rate. Again, this e-mail does not analyze "shaving" of employee pay.

- Based on no factual support in the evidentiary record, Plaintiffs invent the conclusion (Motion at 11-12) that "[t]he daily POS shutdown lasts for 15-30 minutes" and is "effectively . . . a black hole in time which Defendants count as an automatic, unpaid break for its overnight employees." However, McDonald's U.S. Operations Technology Training Manager, Mike Lewis, testified that while the POS shutdown impacts the ability to ring up sales, it **does not** result in a shutdown of the ISP system, an insertion of a break into employee time records, or any systematic loss of time or pay.  (Ex. E, Lewis Dep. 33:18-36:12, 39:23-40:9, 141:1-142:17, 147:8-148:16.)

## IV.   PLAINTIFFS' VARIOUS ADDITIONAL ARGUMENTS FAIL TO SUPPORT THEIR REQUEST FOR CLASS CERTIFICATION.

Plaintiffs raise a smattering of additional arguments in connection with their bid for class certification.  None, however, have any merit.

First, they suggest (Motion at 4) that class proceedings would be superior because putative class members "have relatively small claims when compared to the costs (financially and otherwise) of pursuing those claims."  But, notwithstanding more than 18 months of litigation, Plaintiffs offer nothing more than speculation that anyone (other than them) is interested in pursuing claims against McDonald's.  In any event, regardless of the size of the claims, class proceedings simply are not superior because individualized issues would predominate in the resolution of those claims. In re Wal-Mart Wage & Hour Employment Practices Litig., 2008 U.S. Dist. LEXIS 50928 at *18-19, 62 (individual issues "predominate . . . where plaintiffs' claimed injuries resulted from isolated instances of managers allegedly deviating from the defendant's lawful policies concerning breaks and off-the-clock work").

Second, Plaintiffs cannot achieve class certification by identifying (Motion at 7-10) high-level, *lawful* similarities among putative class members, such as that they are all non-exempt and record their time using McDonald's time recording system.  Such similarities do not provide evidence of a McDonald's policy not to compensate employees for all hours worked, do not

alleviate the need for individualized adjudication to resolve Plaintiffs' varied claims, and do not make class certification appropriate.

Third, Plaintiffs miss the mark with their claims (Motion at 12) that specific McDonald's personnel are "ignoran[t] of their legal responsibilities." For instance, Plaintiffs note that Human Resources Consultant Robert Pennington did not know what the "F" and the "S" in the acronym "FLSA" stood for during his deposition. (Motion at 12.) They also note that Operations Manager Rick Orf testified that he had no opinion as to whether McDonald's or its employees were more responsible for ensuring that employees were paid for all hours worked. But Plaintiffs neglect to mention that Pennington completed 4-6 formal human resources training courses that discussed wage-hour matters, visited Missouri and federal labor websites, and understood Missouri and the FLSA's minimum wage requirements. (Ex. I, Pennington Dep. 34:13-40:23, 70:24-71:7.) And they likewise fail to note Orf's repeated testimony that McDonald's policy is to compensate employees for all hours worked. (Ex. H, Orf Dep. 32:11-25, 196:23-197:11. 217:18-21, 295:20-25.) Plaintiffs cannot achieve class certification through *ad hominem* attacks on Pennington and Orf.

Fourth, Plaintiffs belief that class certification is appropriate due to McDonald's alleged failure to maintain time records is incorrect. (Motion at 13 ("[w]hether or not Defendants failed to maintain accurate time records is certifiable and should be determined on a class wide basis.")). Plaintiffs once again provide no evidence to support their bald assertions. In fact, Plaintiffs' counsel were provided electronic time records from McDonald's dating back to December 2007 and they personally visited a storage facility where they inspected daily Time Punch Change Approval Reports (and other McDonald's records) dating back to February 2005. Moreover, while the Plaintiffs initially asserted a claim for violation of Missouri recordkeeping

33

laws, the Court dismissed that claim long ago.  (See Memorandum & Order, Dkt. No. 72, at 4-5,

11).  Plaintiffs cannot seek class certification of this previously-dismissed claim.

Fifth, Plaintiffs misstate the record in arguing (Motion at 18-19) that there is "a

staggering 100% reported failure rate . . . by McDonald's corporate restaurants in Missouri to

comply with state wage laws."  The only evidence that Plaintiffs rely on are records, produced by

McDonald's per agreement of the parties, that reflect pay-related complaints received by

McDonald's Service Center hotline from employees at four Missouri restaurants: Oakville (Store

No. 10476); Richardson Road (Store No. 17931); Arnold (Store No. 4717); and Martin City

(Store No. 25248). (Ex. 31 to Motion.)  These records indicate that only four employees – two

from Oakville, one each from Richardson Road and Martin City, and none from Arnold – raised

unique concerns about their wages, each of which McDonald's investigated and addressed as

appropriate. (Id.)  Notably, one of these complaints was that Plaintiff Dan Pryor, a salaried

manager at the time, would not release the employee's final paycheck. (Id. at MCDDOYEL

005305.)  And another complaint was forcefully disclaimed by the employee at issue, who

reported that his cousin was playing a joke on him by calling the Service Center. (Id. at

MCDDOYEL 5303-5304.)  In any event, the fact that McDonald's provides a mechanism for

employees to report work-related complaints, and that it has received and addressed varied pay-

related complaints from a handful of employees (over a four-year span) supports only the

proposition that the Company's policy is to compensate employees for all hours worked.

Sixth, Plaintiffs are misguided in their belief that class certification is appropriate

because, in their opinion, McDonald's does not sufficiently "police [its] practices to ensure that

employees are properly compensated for all work performed." (Motion at 19.)  Notably,

Plaintiffs simply ignore McDonald's varied efforts to ensure that employees are properly paid,

including: McDonald's written policies that employees are not to work off-the-clock and must be paid for all hours worked; the fact that Time Punch Change Approval Reports are available daily for employees to review; McDonald's "open door" policy that permits employees to report work-related concerns to any level of management; and McDonald's Service Center hotline that employees can call if they have any concerns about their wages or pay.  (Supra at 3-5.)  But, in all events, Plaintiffs here engage only in misdirection.  As detailed above, they provided no evidence that McDonald's maintains a policy to violate its policy that employees must be paid for all hours worked, and they failed to demonstrate that their claims are amenable to resolution in any way other than individualized, person-by-person, incident-by-incident litigation.  Their personal opinions of how well McDonald's "polices" itself do not change these fundamental realities.

Finally, and contrary to Plaintiffs' assertion (Motion at 34), Defendant's removal of this case to federal court has no bearing on whether a class should be certified.  The case upon which Plaintiffs purportedly rely, Acosta v. Scott Labor LLC, 2006 WL 27118 (N.D. Ill. Jan. 3, 2006), is inapposite. Indeed, the portion of Acosta upon which Plaintiffs' rely addressed whether a class action under Rule 23 could be maintained in conjunction with an FLSA collective action and whether the Court should maintain plaintiffs' FLSA claims in federal court while remanding their state-law claims to state court.  Such questions are not before this Court.

## CONCLUSION

For each and all of these independent reasons, McDonald's respectfully requests that this Court deny Plaintiffs' Motion for Class Certification.

CHI-1736943v2

Dated: January 7, 2010                    By: /s/ Michael J. Gray

                                                Michael J. Gray (admitted *pro hac vice*)
E. Michael Rossman (admitted *pro hac vice*)
Jonathan M. Linas, MO. Bar No. 57974
(admitted *pro hac vice*)
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
Tel: 312.782.3939
Fax: 312.782.8585
mjgray@jonesday.com
emrossman@jonesday.com
jlinas@jonesday.com

*Attorneys for all Defendants*

Charles B. Jellinek, Mo. Bar No. 57107
BRYAN CAVE LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: 314.259.2000
Fax: 314.259.2020
cbjellinek@bryancave.com

*Attorneys for Defendant McDonald's Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2010, I electronically filed the foregoing Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record for Plaintiffs at their e-mail addresses on file with the court:

Edward D. Robertson, Jr.
Mary D. Winter
Anthony L. DeWitt
BARTIMUS, FRICKLETON, ROBERTSON &
GORNY, PC
715 Swifts Highway
Jefferson City, MO 65109
aldewitt@sprintmail.com

Ryan F. Stephan
James B. Zouras
STEPHAN ZOURAS, LLP
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
rstephan@stephanzouras.com

Jonathan W. Cuneo
Jon A. Tostrud
Brent Walton
CUNEO GILBERT & LADUCA, LLP
507 C. St., NE
Washington DC 20002
jtostrud@cuneolaw.com

/s/ Jonathan M. Linas
Attorney for Defendants

CHI-1736943v2